**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000676
31-DEC-2014
07:52 AM**

CAAP-11-0000676

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

SHALLENE ALAYON, Claimant-Appellant,
v.
URBAN MANAGEMENT CORP., and
Hawaii Employers' Mutual Insurance Co. Inc.,
Employer/Insurance Carrier-Appellee.

APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS APPEALS BOARD
(CASE NO. AB 2008-221 (2-05-10803))

MEMORANDUM OPINION
(By: Nakamura, C.J., and Fujise and Ginoza, JJ.)

Claimant-Appellant Shallene Alayon (Alayon) was employed by Employer-Appellee Urban Management Corporation (Urban Management) as a services coordinator. Alayon sought workers' compensation benefits after she slipped and fell at work in August 2005. Alayon had previously been injured in a non-work-related motor vehicle accident in 1999. Although acknowledging that Alayon sustained some injuries from her work-related fall, Urban Management and Insurance Carrier-Appellee Hawaii Employers' Mutual Insurance Company, Inc. (collectively, "Employer") contested the extent of the injuries Alayon claimed were work-related. The main dispute between the parties is whether Alayon's asserted injuries are attributable to her work accident and therefore compensable or whether they are attributable to pre-existing conditions, including injuries she sustained in the motor vehicle accident, and therefore non-compensable.

Alayon appeals from the Decision and Order entered by the Labor and Industrial Relations Appeals Board (Board). The Board concluded in relevant part that: (1) Employer may be liable for Alayon's left knee condition after November 5, 2007, however, the nature and extent of the injury must be determined by the Director of the Department of Labor and Industrial Relations (Director) (Conclusion of Law (COL) 1); (2) Alayon is not entitled to treatment under Dr. Scott McCaffrey's January 11, 2008, treatment plan for a neurological consult with Dr. Ray Romero (COL 2); (3) Alayon is not entitled to, and Employer is not liable for, temporary total disability (TTD) benefits from June 8, 2007, through November 20, 2009 (COL 3); and (4) the Board would not decide whether Employer was entitled to a credit against future permanent partial disability (PPD) benefits, if any, for indemnity benefits paid from January 11, 2006, to June 7, 2007, and would leave that determination to the Director (COL 4).

On appeal, Alayon contends that the Board erred in each of these conclusions and in certain findings of fact made in support of the conclusions. As explained in greater detail below, we hold that: (1) with respect to COL 1 and COL 4, the Board did not render a final decision for this court to review, and we decline to address the issues raised by Alayon regarding COL 1 and COL 4 in the absence of a final decision by the Board; (2) COL 2 is affirmed; (3) COL 3 is vacated on the ground that the Board must decide a claim for TTD benefits on the merits and cannot deny Alayon's claim for TTD benefits based solely on the asserted failure of her physicians to submit disability certifications in the proper form. We remand the case for further proceedings consistent with this Memorandum Opinion.

BACKGROUND

Alayon was employed by Urban Management as a services coordinator in a federal housing project, in which she investigated the needs of tenants in the housing project and set

2

up classes and meetings. On August 23, 2005, Alayon slipped and fell at work. Employer did not deny liability for the work fall, and it filed a WC-1 Employer's Report of Industrial Injury, which described Alayon's injuries as "[p]ossible sprained left wrist, hand, buttocks (x-rays)."

I. Pre-existing Conditions

Prior to her August 23, 2005, work-related fall, Alayon had a history of migraine headaches and left knee, low back, and neck problems, including injuries caused by a May 31, 1999, motor vehicle accident. In a settlement agreement arising out of the motor vehicle accident, the injuries Alayon sustained in that accident were described as follows:

> As a result of the Accident, [Alayon] sustained certain injuries including but not limited to headaches, neck, shoulder and low back pains, temporomandibular joint pain, vertebral disc bulging and herniation, right carpel tunnel syndrome, dizziness, nausea . . . .

Alayon's injuries and physical conditions that pre-existed her August 2005 work-related fall are as follows.

Alayon had a history of left knee problems since she was a teenager, including the clicking and buckling of the knee. In a February 3, 2005, medical note, Jeffrey Lee, M.D., an orthopedic surgeon, documented his suspicion that Alayon had a left knee medial meniscal tear. On May 17, 2005, Dr. Lee scheduled Alayon for knee surgery, to perform an arthroscopy and meniscal tear resection, but Alayon cancelled the surgery.

In July 1999, Gregory H. Chow, M.D., an orthopedic surgeon, noted that Alayon complained of headaches, and he diagnosed her condition as "cervical strain whiplash" and "post whiplash headaches." In a February 2001 medical report, Todd T. Tasaki, D.D.S., stated that Alayon complained of headaches "four plus times per week on average[.]" Thomas McNorton, M.D., a neurologist, conducted electrodiagnostic testing on May 3, 2001, May 10, 2001, and September 24, 2003, which revealed C7 radiculopathy, right L5 radiculopathy, and right S1

radiculopathy, respectively.[1] Dr. McNorton's notes also reveal that Alayon complained of headaches during visits in 1997, 1998, 1999, and 2001.

A March 10, 2004, letter from Dr. Lee stated that Alayon may be a candidate for back surgery after her pregnancy if her neck and low back conditions persisted. His diagnoses were cervical disc protrusion at C5-6 and disc herniation and degeneration at L5-S1. Alayon's medical records also included a March 4, 2004, patient registration which indicated that Alayon was "pending back surgery" and had been in this status for four years.

## II.   The August 23, 2005, Work Injury

On August 23, 2005, Alayon slipped and fell at work. Alayon reported that her feet went out and she landed on her left buttock, left wrist, and left hand. She also claimed that she hit her head against a stone wall outside the elevator door.

After her fall, Alayon sought treatment from her primary care physician, Fortunata Gozun, M.D., who referred her to WorkStar Occupational Health Services (WorkStar), where she was treated by Scott McCaffrey, M.D., and others. Dr. McCaffrey noted that on August 23, 2005, Alayon complained about pain to her neck, right lower back, right buttock, left thigh, left wrist and hand, all at a 5/10 level of severity. His diagnostic assessment of Alayon included: "1. Cervical strain/sprain. 2. Closed head injury-possible concussion. 3. Lumbosacral strain/sprain (rule out internal derangement) with a previous history of an MVA [(motor vehicle accident)] in 1999 with disc derangement. 4. Left wrist strain/sprain. 5. Upper extremity neuroesthesias, left greater than right. 6. Left knee dysfunction with history of ligamental tear." (Formatting altered.) Dr. McCaffrey prescribed Relafen and physical therapy. With respect to work, Alayon was placed on "off duty" status, but

---

[1] C7, L5, and S1 refer to various numbered vertebrae of the spine, with "C" standing for cervical, "L" for lumbar, and "S" for sacrum. See Hart v. Van Zandt, 399 S.W.2d 791, 793 (Tex. 1965).

was given "the option to work full duty." Thereafter, Alayon continued to seek treatment through WorkStar.

After her work accident, Alayon returned to work for Urban Management, but stopped working there in October 2005. According to Alayon, she started working for a different employer on June 8, 2009, stopped working on February 26, 2010, and was terminated in April 2010.

### III. Director's Decisions and Proceedings

The Director issued four decisions regarding disputes between Alayon and Employer. Alayon appealed only Decisions #3 and #4 to the Board. Between the hearing on and issuance of Decision #1, Employer sent a letter to Alayon stating that it would commence paying weekly indemnity benefits under protest. Also between Decision #1 and Decision #2, Employer obtained an independent medical examination (IME) of Alayon by Dr. John S. Endicott, M.D.

### 1. The Director's February 16, 2006, Decision (Decision #1)

Following a hearing on January 11, 2006, the Director issued Decision #1 on February 16, 2006, which determined that Alayon sustained injuries to her head, neck, back, left wrist, left knee, left hip, and left buttock as the result of her work accident. In Decision #1, the Director ruled that: (1) Employer must provide benefits to Alayon for "such medical care, services and supplies as the nature of the injury may require"; (2) Alayon was entitled to TTD benefits from November 14, 2005, through January 10, 2006, at a weekly compensation rate of $415.35;[2] (3) Employer was liable for a 20% penalty under Hawaii Revised Statutes (HRS) § 386-92 for failure to pay TTD; and (4) matters

---

[2] Employer had suspended its payment of TTD benefits to Alayon on November 14, 2005, based on its allegation that Alayon had obstructed the completion of IMEs scheduled by Employer. The Director found that Alayon had not obstructed the IMEs and that Employer was not entitled to unilaterally suspend payment of TTD benefits without a ruling by the Director on the obstruction allegation.

of permanent disability and/or disfigurement would be determined at a later date.

Between the date of the hearing on and the issuance of Decision #1, Employer notified Alayon by letter to her lawyer dated January 19, 2006, that it would "commence weekly indemnity payments starting on January 11, 2006 until such a time the Director issues a Decision from the hearing. These payments are made in order not to prejudice [Alayon] of the need of workers' compensation benefits while we await the Director's Decision." Employer included a check in the amount of $1,214.85 and stated that the "payments are made under protest" and are considered by Employer as "advance PPD benefits." The letter also informed Alayon that "[i]n the event the Decision is adverse to [Alayon], we will terminate the benefits immediately. At that point, we shall seek a reimbursement from [Alayon] or shall assert a credit against PPD." The letter stated that it was written pursuant to HRS § 386-52 and Hawai'i Administrative Rules (HAR) § 12-10-24. Employer's letter did not inform Alayon that she had the right to file a written request for a hearing to submit evidence to dispute the Employer's request for a credit.

On February 21, 2006, Employer appealed Decision #1 to the Board, arguing that the Director's computation of Alayon's weekly TTD compensation was based on a clerical error. The appeal to the Board was resolved by the parties entering into a stipulation that resulted in a $404.95 weekly compensation rate for Alayon.

2.    Dr. Endicott's IME

Dr. Endicott performed an IME of Alayon on February 13, 2006, and submitted a report on March 21, 2006. Dr. Endicott concluded that "[i]t appears that [Alayon's] head contusion, cervical strain, and left wrist sprain have reached medical stability, have improved and resolved with normal examinations." He opined that Alayon "does not need further medical care for her headache complaints, her neck pain complaints, or her left wrist

6

complaints as there are no objective correlates to substantiate need for treatment."

With respect to Alayon's left knee, Dr. Endicott opined that her left knee condition was not caused or aggravated by her slip and fall as there were no documented left knee complaints related to the slip and fall and her medical records from Dr. Lee showed that her left knee pathology predated her slip and fall.

With respect to Alayon's complaints of headaches, Dr. Endicott noted a normal neurologic exam and that "she has a longstanding pre-existing history of headaches."

With respect to Alayon's lumbar spine, Dr. Endicott opined that her lumbar spine may not be medically stable and that her condition may improve with further treatment.  He noted, however, that a recent January 4, 2006, MRI showing degenerative disc disease at L5-S1 was very similar to the descriptions he reviewed of MRIs previously taken in 2001 and 2003 (the prior MRIs were not available for him to do a side-by-side comparison with the recent MRI).  Dr. Endicott also opined that "passive treatment such as massage, chiropractic treatment, or other passive modalities are counterproductive."

Dr. Endicott prepared a supplemental IME report on July 12, 2006.  He noted that based on his comparison of the January 4, 2006, and September 3, 2003, MRIs of Alayon's lumbar spine, he concluded that the more recent January 2006 MRI did not reveal "evidence of any enlargement or worsening of the disc herniation which has been chronic since 2001."  Dr. Endicott opined that "there is no evidence of a permanent aggravation of [Alayon's] pre-existing [lumbar] condition[,]" which appeared to be "returning to pre-[work]-injury baseline status[.]"  Dr. Endicott noted that Alayon would be medically stable and ratable as to her low back condition after she completed her course of physical therapy.

Based on Dr. Endicott's IME reports, Employer denied further treatment for Alayon's injuries, except physical therapy for her low back and psychological treatment.

3.    The Director's September 12, 2006, Decision
      (Decision #2)

Following a hearing on August 2, 2006, to determine Employer's continued liability for Alayon's medical care and treatment, the Director issued Decision #2 on September 12, 2006. In Decision #2, the Director upheld Employer's denials of (1) an April 5, 2006, treatment plan by Dr. McCaffrey requesting a cervical MRI, (2) payment for Toradol, and (3) further massage therapy. Employer had given notice of these denials in letters dated April 13, 2006. The Director based his decision on Alayon's failure to timely object to Employer's denials of coverage and the opinions of Dr. Endicott set forth in his March 21, 2006, IME report. The Director's findings of fact stated that Alayon "is entitled to physical therapy for the low back only; all massage therapy is denied; care for the neck and left wrist and head is denied; [Employer] has accepted psychological treatment and temporary total disability payments continue to be paid."

With respect to Alayon's left knee condition, the Director made the following findings of fact:

> At the onset of the hearing, [Employer] attempted to deny compensability of the left knee condition based on the opinion of Dr. Endicott. However, the Hearings Officer advised [Employer's] representative that in the initial Decision, the Director found the left knee condition to be a compensable injury of this incident. Therefore, in the absence of an appeal, [Employer] is not allowed to re-litigate this aspect at this time.

> . . . .

> [Employer] has denied any further care for the head contusion, cervical strain and left wrist sprain based on the opinion of Dr. Endicott that these conditions have resolved. Dr. Endicott has also documented that [Alayon's] headache complaints remain, but the neurological examination was normal and [Alayon] does have a pre-existing history. Any of [Employer's] denials based on treatment plans which have gone uncontested shall remain denied. However, as previously discussed, [Employer] shall not be allowed to deny care for the left knee based on the opinion of Dr. Endicott that the knee was not injured in this incident. By Decision of the Director dated 2/16/2006, it is clear that the left knee was found to be a compensable injury and [Employer] remains liable for any necessary care and treatment.

Neither party appealed Decision #2 to the Board.

8

Employer notified Alayon, by letter to her attorney dated May 23, 2007, that she was "not entitled to any further PPD advances as the payments are substantial and exceed the rating report prepared by Dr. Endicott." Employer stated that the indemnity payments would continue for fourteen days, but would terminate after June 7, 2007.

4.   The Director's April 7, 2008, Decision (Decision #3)

On April 7, 2008, the Director issued Decision #3, which addressed the following issues: (1) whether Employer properly denied Dr. McCaffrey's treatment plan, dated November 5, 2007, requesting knee surgery by Dr. Lee; and (2) whether Employer properly denied Dr. McCaffrey's treatment plan, dated January 11, 2008, requesting a neurological consult with Ray Romero, M.D., a neurologist.

In Decision #3, the Director denied Dr. McCaffrey's November 5, 2007, treatment plan for knee surgery.[3] The Director also terminated Employer's liability for Alayon's left knee condition as of November 5, 2007, because the Director determined that the condition reverted to pre-work-injury status. With respect to Alayon's left knee condition, the Director found:

> By Decision dated 9/12/2006, the Director found that [Employer] would remain liable for [Alayon's] left knee care and would not be allowed to utilize the opinion of Dr. Endicott that no left knee injury resulted from this incident. However, by review of the records, it is clear that [Alayon] received care for her left knee with Dr. Lee at least through 5/2005 when she cancelled surgery. By letter dated 6/6/2005 to [Alayon's] then-attorney, Dr. Lee noted that [Alayon] was scheduled for arthroscopic surgery on 5/17/2005, which she subsequently cancelled. Dr. Lee also wrote that surgery remains a recommendation and the procedure would consist of arthroscopy and meniscal tear resection. Dr. McCaffrey's request of 11/5/2007 indicated that the referral to Dr. Lee was for left knee arthroscopy and partial menisectomy: this appears to be the same condition Dr. Lee referenced in 2005. Therefore, the left knee injury of 8/23/2005 should be deemed a temporary aggravation which reverted to pre-injury status at the point that it was determined she once again requires surgery. It

---

[3] Employer denied the treatment plan for knee surgery on November 7, 2007, based on the opinions provided by Dr. Endicott after his IME.

9

is also at this point that [Employer's] liability for the
left knee ends.

(Emphasis added.) The Director ordered that "[Employer's]
liability for the left knee condition terminates as of 11/5/2007
when it reverted to pre-injury status" and that the 11/5/2007
treatment plan of Dr. McCaffrey regarding the left knee
"remain[s] denied."

In Decision #3, the Director also denied Dr.
McCaffrey's January 11, 2008, treatment plan for a neurological
consult with Dr. Romero. The Director found:

> As for the neurosurgical consult request, the
> Director's decision dated 9/12/2006 denied further care for
> [Alayon's] neck, left wrist and head conditions. The
> findings of Dr. Endicott was cited to for his opinion that
> the neurological examination was normal, and although
> [Alayon] continued to have complaints, she also had a pre-
> existing history. As the previous neurological exam proved
> negative, [Alayon] should not be availed of another
> neurological consult.

The Director concluded that Employer properly denied Dr.
McCaffrey's January 11, 2008, treatment plan for a neurological
consult and ordered that such treatment plan "remain[s] denied."

> 5. Alayon's Appeal of Decision #3 to Board.

On April 25, 2008, Alayon appealed Decision #3 to the
Board. The issues to be determined were: (1) whether Employer is
liable for Alayon's left knee condition after November 5, 2007;
(2) whether Alayon is entitled to treatment under Dr. McCaffrey's
November 5, 2007, treatment plan for knee surgery by Dr. Lee; and
(3) whether Alayon is entitled to treatment under Dr. McCaffrey's
January 11, 2008, treatment plan for a neurological consult with
Dr. Romero.

While the appeal was pending, Alayon obtained knee
surgery from Dr. Lee on July 15, 2008. The surgery was for a
torn medial meniscus in her left knee.

On August 5, 2008, Alayon moved that the Board
temporarily remand the case to the Director to permit Alayon to
request a hearing to compel Employer to pay further TTD benefits
with respect to her lower back. Alayon argued that her attending

10

physician had opined that Alayon remained disabled due to a work-related low back injury and that Employer had improperly stopped paying TTD benefits after June 8, 2007, even though her attending physician kept her off work. The case was remanded back to the Director for determination regarding Employer's non-payment of TTD benefits after June 7, 2007, relevant penalties, if any, and any other issue the Director deemed appropriate.

6. The Director's February 23, 2009 Decision (Decision #4)

On February 23, 2009, the Director issued Decision #4, on remand from the Board, which denied Alayon's request for further TTD benefits. The Director found as follows:

> [Alayon's] representative focused on the low back as the basis of [Alayon's] disability and entitlement to TTD benefits. However, by Decision dated 9/12/2006, the Director allowed only for further physical therapy based on the opinion of Dr. Endicott as contained in his report dated 7/12/2006. In this report, Dr. Endicott stated that his recommendation would be only for the completion of [Alayon's] physical therapy program as regards the low back; that the lumbar condition would be stable upon completion of the course. He further commented that the 1/4/2006 and 9/3/2003 lumbar MRI's produced essentially the same results. Thus, he concluded that the disc herniation has been chronic since 2001. This opinion would be in keeping with Dr. McCaffrey's reports, which consistently noted a lumbar condition related to a 1999 MVA. For Dr. McCaffrey to produce a letter in 2008 alleging that his statements relating [Alayon's] low back condition to a 1999 MVA was in error, and that in actuality it is the result of the industrial incident is questionable and self-serving at best. Dr. Endicott's opinion justifies the termination of [Employer's] liability for [Alayon's] low back care, as, upon completion of physical therapy, she would have attained pre-injury status.

The Director concluded that Alayon "is not entitled to further TTD benefits" and ordered that Alayon's "request for further [TTD] benefits is hereby denied."

IV. The Board's Decision and Order

Alayon appealed Decisions #3 and #4 to the Board. The Board entered its Second Amended Pretrial Order, which stated that the issues to be determined were: (1) whether Employer is liable for Alayon's left knee condition after November 5, 2007; (2) Whether Alayon is entitled to treatment under Dr. McCaffrey's treatment plan dated January 11, 2008, for a neurological consult

11

with Dr. Romero; (3) what is the period of TTD resulting from the August 23, 2005, work injury after June 7, 2007; and (4) whether Employer is entitled to a credit against future PPD benefits, if any, for indemnity benefits paid from January 11, 2006, to June 7, 2007.

After a trial on July 6, 2010, the Board issued its August 11, 2011, Decision and Order that modified in part and affirmed in part the Director's Decisions #3 and #4. The Board concluded in relevant part: (1) Employer may be liable for Alayon's left knee condition after November 5, 2007, however, the nature and extent of the injury must be determined by the Director (COL 1); (2) Alayon is not entitled to treatment under Dr. McCaffrey's January 11, 2008, treatment plan for a neurological consult with Dr. Romero (COL 2); (3) Alayon is not entitled to, and Employer is not liable for, TTD benefits from June 8, 2007, through November 20, 2009 (COL 3); and (4) the Board would not decide whether Employer was entitled to a credit against future PPD benefits, if any, for indemnity benefits paid from January 11, 2006, to June 7, 2007, and would leave that determination to the Director (COL 4). This appeal followed.

DISCUSSION

I.

The following legal standards are applicable to our review of the Board's decisions in workers' compensation cases. Hawai'i's workers' compensation law is codified in HRS Chapter 386. Under HRS § 386-3(a) (Supp. 2013), an employee is entitled to compensation for personal injury suffered "by accident arising out of and in the course of the employment . . . ."

HRS § 386-85(1) (1993) creates a presumption in favor of a workers' compensation claimant that the claim is for a covered work injury. This presumption controls unless the employer can produce substantial evidence to rebut it. See Nakamura v. State, 98 Hawai'i 263, 267-68, 47 P.3d 730, 734-35 (2002). Substantial evidence in this context is "relevant and credible evidence of a quality and quantity sufficient to justify

a conclusion by a reasonable person that an injury or death is not work-connected." Id. (internal quotation marks, citation, and brackets omitted).

We review the Board's findings of fact under the clearly erroneous standard. Id. at 267, 47 P.3d at 734. Under this standard, we consider whether the Board's factual findings are "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." Id. (block quote format, brackets, and citation omitted). We are required to sustain the Board's factual findings if supported by substantial evidence unless we are "left with a firm and definite conviction that a mistake has been made." Tauese v. State, Dep't of Labor & Indus. Relations, 113 Hawai'i 1, 25, 147 P.3d 785, 809 (2006) (internal quotation marks and citation omitted). We review the Board's conclusions of law de novo, under the right/wrong standard. Nakamura, 98 Hawai'i at 267, 47 P.3d at 734 (block quote format and citation omitted). We give deference to the Board with respect to questions concerning the credibility and weight of the evidence.

> It is well established that courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field.

Id. at 268, 47 P.3d at 735 (block quote format altered and citation omitted).

II.

On appeal, Alayon argues that Employer is liable for her left knee condition after November 5, 2007. Alayon appears to contend that the Board erred in COL 1 in failing to reach this definitive conclusion in her favor. Instead, the Board in its COL 1 declined to determine whether Employer was liable for Alayon's left knee condition after November 5, 2007, because it ruled that the nature and extent of the injury had yet to be

13

determined by the Director. The Board's COL 1 provides in relevant part:

> The Board concludes that [Alayon] may be entitled to, and Employer may be liable for, [Alayon's] left knee condition related to the August 23, 2005 work injury after November 5, 2007. The nature and extent of said injury, however, has yet to be determined by the Director. Such a determination is particularly relevant and important when [Alayon] had a significant pre-existing condition, for which surgery was considered necessary, before the August 23, 2005 work accident and also because [Alayon] has not filed a WC-5 claim for her left knee.

Because the Board did not render a final decision regarding whether Employer is liable for Alayon's left knee condition after November 5, 2007, there is no final decision on this issue for this court to review, and we decline to resolve this issue absent a decision by the Board.

We note, however, that what the Board means by its statement that "the nature and extent of [Alayon's left knee] injury has yet to be determined by the Director" is confusing. In Decision #3, the Director specifically ordered that "[Employer's] liability for [Alayon's] left knee condition terminates as of 11/5/2007 when it reverted to pre-injury status," and the Director denied Dr. McCaffrey's November 5, 2007, treatment plan for left knee surgery.

We are also confused by the Board's statement that

> [e]ven if an injury returns to pre-work injury status, this does not necessarily mean that the duty to provide compensation or benefits ends. Absent a showing of an intervening or superseding event or cause, fraud, or other appropriate terminating event, there is a likelihood that such obligation to provide medical care, services, and supplies will not terminate.

If the portion of an employee's injury and condition that is attributable to a work-related accident has been resolved and the employee has returned to his or her pre-work-accident condition, it is not clear why an employer would remain liable for future medical care. The Board should clarify these matters when the case is remanded.

14

III.

Alayon argues that the LIRAB erred when it ruled that she was not entitled to treatment under Dr. McCaffrey's January 11, 2008, treatment plan. We disagree.

Dr. McCaffrey's January 11, 2008, treatment plan requested a consultation with Dr. Romero, a neurologist, for a "specialist opinion" and simply noted a diagnosis of "post concussion syndrome; lightheaded." The treatment plan did not indicate why a neurological consult with Dr. Romero was reasonable and necessary with respect to Alayon's work injury. The Employer denied the treatment plan based on Dr. Endicott's March 21, 2006, IME report. In that report, Dr. Endicott opined that Alayon's work-related head injury had been resolved, and he also stated that "[Alayon] has complaints of headaches, although a normal neurologic exam is noted and she has a longstanding pre-existing history of headaches." In Decision #3, the Director denied the January 11, 2008, treatment plan, citing the denial of further care for Alayon's head condition in Decision #2 (issued on September 12, 2006), which had referred to Dr. Endicott's findings that Alayon's neurological examination was normal and that Alayon had a pre-exiting history of headaches.

In affirming the Director, the Board ruled that Alayon was not entitled to a neurological consult with Dr. Romano under Dr. McCaffrey's January 11, 2008, treatment plan. In support of its ruling, the Board found that (1) on December 26, 2007, Alayon had reported that Fortunata N. Gozun, M.D., her primary physician, had done a full evaluation and work up and that all tests were negative; (2) the request for the neurological consult was generated at Alayon's request and had not been "recommended as reasonable or necessary by [Alayon's] attending physician[,] Dr. Baloy, who was the only physician who examined [Alayon's] head and neck around the time of the treatment plan"; (3) there was no indication that Dr. McCaffrey examined Alayon's neck or head in the period immediately preceding his treatment plan; and (4) Dr. McCaffrey's request for consultation did not provide a

reason for the referral, did not meet the requirements of the Workers' Compensation Medical Fee Schedule, and was inadequate.

We conclude that these findings were supported by substantial evidence and that the Board did not err in its conclusion that Alayon was not entitled to a neurological consult under Dr. McCaffrey's January 11, 2008, treatment plan. As Employer concedes, the Board's finding that Alayon's request for review of Employer's denial of the treatment plan was untimely is clearly erroneous. However, we conclude that this error was harmless because the Board did not rely on its untimeliness finding in rendering its decision, and instead decided on the merits whether Alayon was entitled to a neurological consult under the January 11, 2008, treatment plan.

IV.

Alayon contends that the Board erred in concluding that she was not entitled to, and Employer was not liable for, TTD benefits from June 8, 2007, through November 20, 2009. Although the Board made certain findings of fact that went to the merits of whether Alayon was entitled to TTD benefits as a result of her work-related injuries, its explanation for ruling that Alayon was not entitled to TTD benefits from June 8, 2007, through November 20, 2009, only focused on asserted deficiencies in the certifications of disability submitted by Alayon's physicians. We conclude that the Board is required to decide whether an employee is entitled to TTD benefits on the merits and cannot deny a TTD claim based solely on asserted deficiencies in certifications of disability submitted by the employee's physicians. We therefore vacate the Board's ruling that Alayon was not entitled to TTD benefits from June 8, 2007, through November 20, 2009, and remand for further proceedings.

A.

Employer, under protest, paid Alayon weekly indemnity benefits, which Alayon viewed as TTD benefits and Employer

characterized as advance PPD benefits, from October 14, 2005 to June 7, 2007. By letter to Alayon's attorney dated May 23, 2007, Employer notified Alayon that its "PPD advances" would be terminated as of June 7, 2007. Employer's letter also notified Alayon that she could request a hearing with the Director if she disagreed with Employer's termination of indemnity benefits.

Alayon's WorkStar physicians submitted numerous interim reports after June 7, 2007, which detailed Alayon's ongoing complaints, changes in her condition since her last visit, results of examinations, diagnostic impressions, treatment plans, and work status. These interim reports described her work status as "off duty."

On September 5, 2008, the case was remanded from the Board to the Director, at Alayon's request, for the Director to determine Alayon's eligibility for TTD benefits effective June 8, 2007. Citing Dr. Endicott's opinion, the Director denied Alayon's request for further TTD benefits after June 7, 2007. Alayon appealed this decision to the Board.

B.

The Board made numerous findings on this issue, including findings that: (1) Alayon's physicians failed to provide certifications specifically stating that she was temporarily and totally disabled because of work-related injuries; (2) Alayon's medical records indicated that her lumbar injuries were the result of the 1999 motor vehicle accident, although Dr. McCaffrey claimed this was a clerical error; (3) Alayon's medical records indicated that various physicians did not examine her low back on many occasions during visits between January 11, 2006, and November 20, 2009; (4) "Samuel M. Ruben, M.D., a specialist in preventive medicine, noted that [Alayon] was released to either modified or full duty for the period July 25, 2009 through at least October 31, 2009"; and (5) the Board "does not credit Dr. McCaffrey's certifications because they are

inconsistent with the medical records and because they are based on the examinations of others."

However, the Board's COL 3, which ruled that Alayon was not entitled to TTD benefits from June 8, 2008, through November 20, 2009, focused entirely on the inadequacy of the certifications of disability submitted by Alayon's physicians as the basis for the Board's ruling:

> 3. The Board concludes that [Alayon] is not entitled to, and Employer is not liable for, temporary total disability resulting from the August 23, 2005 work injury after June 7, 2007 through November 20, 2009.

> As stated in *Alexis A.L. Kassebeer v. Paul J. Samarin,* AB 2007-207 (October 2, 2009):

> > A medical certification of temporary total disability requires an attending physician to certify that a claimant's absence from work is due to disability attributed to a specific work injury or condition. Without such certification, an award of temporary total disability is not proper.

> The Board interprets the workers' compensation laws and rules to require certifications of disability by a treating physician to be contemporaneous, to be in writing, and to include the date of accident for which such disability is certified. *See, Ralph Edayan v. City and County of Honolulu, Facility Maintenance,* AB 2004-484 (June 21, 2010). In the instant case, for the periods in question, there is no disability certification of record from [Alayon's] attending physician documenting total disability attributed to [Alayon's] August 23, 2005 work-related injuries.

> The physicians of WorkStar simply stated that [Alayon] was "off duty."

> . . . .

> The Board makes no determination as to [Alayon's] entitlement to TTD benefits after November 20, 2009.

C.

We conclude that the Board erred in relying solely on the inadequacy of the interim reports submitted by Alayon's physicians as certifications of disability in ruling that Alayon was not entitled to TTD benefits.

HRS § 386-96 (Supp. 2013)[4] governs the reports that physicians who provide treatments and services to workers' compensation claimants must prepare and submit.  HRS § 386-96(a) provides that "[a]ny physician, surgeon, or hospital that has

---

[4] HRS § 386-96 states, in relevant part:

§ 386-96 **Reports of physicians, surgeons, and hospitals.** (a) Any physician, surgeon, or hospital that has given any treatment or rendered any service to an injured employee shall make a report of the injury and treatment on forms prescribed by and to be obtained from the department as follows:

    (1)    Within seven days after the date of first attendance or service rendered, an initial report shall be made to the department and to the employer of the injured employee in the manner prescribed by the department;

    (2)    Interim reports to the same parties and in the same manner as prescribed in paragraph (1) shall be made at appropriate intervals to verify the claimant's current diagnosis and prognosis, that the information as to the nature of the examinations and treatments performed is complete, including the dates of those treatments and the results obtained within the current reporting period, the execution of all tests performed within the current reporting period and the results of the tests, whether the injured employee is improving, worsening, or if "medical stabilization" has been reached, the dates of disability, any work restrictions, and the return to work date.  When an injured employee is returned to full-time, regular, light, part-time, or restricted work, the attending physician shall submit a report to the employer within seven calendar days indicating the date of release to work or medical stabilization; and

    (3)    A final report to the same parties and in the same manner as prescribed in paragraph (1) shall be made within seven days after termination of treatment.

. . . .

    (b)   No claim under this chapter for medical treatment, surgical treatment, or hospital services and supplies, shall be valid and enforceable unless the reports are made as provided in this section, except that the director may excuse the failure to make the report within the prescribed period or a nonsubmission of the report when the director finds it in the best interest of justice to do so.  If the director does not excuse the submission of:

    (1)    An initial or interim report within the time prescribed in subsection (a)(1) and (2); or

    (2)    A final report that is thirty days late or a nonsubmission,

the delinquent physician shall be fined not more than $250.

given any treatment or rendered any service to an injured employee shall make a report of the injury and treatment on forms prescribed by and to be obtained from the [Department of Labor and Industrial Relations (Department)][.]"  Pursuant to HRS § 386-96, the Department promulgated HAR § 12-15-80, which requires physicians providing services to workers' compensation claimants to submit monthly "Interim WC-2 reports," that shall, among other things, include "[d]ates of disability, work restrictions, if any, and return to work date."

HRS § 386-96 and HAR § 12-15-80 permit sanctions to be imposed on a physician who fails to comply with the applicable reporting requirements.[5/]  However, nothing in these provisions indicates that a physician's failure to comply with the reporting requirements can be used to justify the denial of TTD benefits to a workers' compensation claimant.  Indeed, HRS § 386-31(b) (Supp. 2013), which sets forth an employee's right to TTD benefits, provides that "[w]here a work injury causes total disability not determined to be permanent in character, the employer, for the duration of the disability, but not including the first three calendar days thereof, shall pay the injured employee [the prescribed weekly TTD benefit]."  "Eligible claimants should not be denied benefits under Hawai'i['s] workers' compensation law simply because their physician failed to properly word the requisite report."  Panoke v. Reef Development, No. CAAP-11-0000556, 2014 WL 2949410, at *5 (Hawai'i App. Jun. 30, 2014) (SDO).

The Board may consider the lack of specificity or other deficiencies in certifications of disability in assessing the evidentiary weight it should give to the certifications. However, the Board cannot deny a claimant's request for TTD

---

[5/] HRS § 386-96(b) provides that unless excused by the Director, a physician who submits untimely reports or fails to submit a final report shall be fined not more than $250.  HAR § 12-15-80(c) states that "[t]he repeated failure of a physician, surgeon, hospital, or provider of service to comply with chapter 386, HRS, and any related rules shall be a reasonable basis for an employer to refuse to pay or withhold payment for services rendered."

benefits based solely on a physician's failure to submit the certifications of disability in the proper form. If the evidence in the record shows that a claimant is entitled to TTD benefits, then the physician's non-compliance with the certification requirements does not justify denial of the TTD benefits. In this case, for example, Alayon and Dr. McCaffrey testified at the hearing before the Board. If their testimony and other evidence in the record established that Alayon was entitled to TTD benefits from June 8, 2007, through November 20, 2009, then the Board should have granted Alayon's request for TTD benefits, notwithstanding any deficiencies in her physicians' certifications of disability.

Because the Board appears to have based its decision solely on the asserted deficiencies in the certifications of disability submitted by Alayon's physicians, and not on the merits of her eligibility for TTD benefits, we vacate the Board's ruling that Alayon was not entitled to TTD benefits from June 8, 2007, through November 20, 2009. We remand the case to the Board for a determination of Alayon's eligibility for TTD benefits on the merits.[6]

## V.

In its COL 4, the Board stated: "The Board makes no conclusions concerning Employer's entitlement to a credit against future [PPD], if any, for indemnity benefits paid from January 11, 2006 to June 7, 2007. Rather, that determination is left to the Director." Despite the Board's failure to render a final decision on this issue, Alayon contends that the Board erred and asks that this court rule that no credit should be applied.

---

[6] We note that Alayon contends that the Board engaged in impermissible rulemaking, without complying with the requirements of HRS Chapter 91, by requiring, through its decisions in workers' compensation appeals, that certifications of disability by a treating physician be contemporaneous, be in writing, and include the date of accident for which such disability is certified. In light of our conclusion that the Board erred in basing its denial of Alayon's request for TTD benefits on the asserted deficiencies in her physicians' certifications of disability, we need not reach Alayon's contention regarding improper rulemaking to resolve this appeal. We therefore do not address Alayon's contention regarding improper rulemaking.

21

Similar to the Board's COL 1, there is no final decision by the Board for this court to review. We decline Alayon's invitation to rule on the question of Employer's entitlement to a credit against future PPD in the absence of a decision by the Board.

CONCLUSION

Based on the foregoing, we affirm COL 2 and vacate COL 3 of the Board's Decision and Order, and we remand the case for further proceedings consistent with this Memorandum opinion.

DATED: Honolulu, Hawai'i, December 31, 2014.

On the briefs:

Wayne H. Mukaida
for Claimant-Appellant

Kenneth T. Goya
J. Thomas Weber
Monica K. Suematsu
(Ayabe, Chong, Nishimoto,
Sia & Nakamura LLLP)
for Employer/Insurance
Carrier-Appellee

*Craig H. Nakamura*

Chief Judge

*[signature]*

Associate Judge

*[signature]*

Associate Judge

22